**Peter W. MAKAREWICZ, Petitioner, Appellant,**

v.

**Palmer C. SCAFATI, Superintendent of the Massachusetts Correctional Institution at Walpole, Massachusetts, Respondent, Appellee.**

**No. 7739.**

United States Court of Appeals, First Circuit.

Feb. 24, 1971.

Certiorari Denied May 17, 1971. See 91 S.Ct. 1685.

Chester C. Paris, Cambridge, Mass., for appellant.

Bernard Manning, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., and John J. Irwin, Jr., Asst. Atty. Gen., Chief, Criminal Division, were on the brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

On March 17, 1955, petitioner was convicted by a jury in Superior Court in Massachusetts of the first degree murder of Geraldine Annese. He is currently serving a life sentence at Massachusetts Correctional Institution, Walpole. The murder occurred in Norwood, Massachusetts, on Thursday evening, November 4, 1954. Petitioner was fifteen years old; the victim was a neighbor and former girl friend. According to his confession to the police, which was admitted into evidence at trial over his objection, petitioner left his home shortly after 9:30 p. m. on the evening of the crime through a cellar door. He waited in a garage located next to the victim's house for about fifteen minutes. When the Annese girl passed by on her way home from a date, petitioner called to her to enter the garage, which she did. He strangled her by the throat with his hands until her hands "stopped moving," removed her clothes and raped her. Petitioner told the police that he noticed that the victim was menstruating that day. He then returned to his home through the cellar door.

Before admitting petitioner's confession into evidence at the trial, the judge conducted an extensive *voir dire,* during which both sides called witnesses. In addition, the jury was instructed to consider whether or not the confession was voluntary. On appeal, the Massachusetts Supreme Judicial Court affirmed the conviction, ruling *inter alia* that the confession was admissible. Commonwealth v. Makarewicz, 333 Mass. 575, 132 N.E.2d 294 (1956). On August 28, 1968, petitioner filed a petition for a writ of error in the Supreme Judicial Court, again challenging the admissibility of his confession. In accordance with Mass.Gen.Laws ch. 250, §§ 9 and 11 the writ was considered by a single justice of the court, who denied it. Although entitled to do so under Massachusetts law, *see* discussion *infra,* petitioner did not appeal that decision to the full bench of the court.[1] In May 1969 he filed a petition for habeas corpus in the United States District Court pursuant to 28 U.S.C. § 2254 on the same grounds, *viz.,* that his conviction had been based on an involuntary confession. No evidentiary hearing was held; the district court denied the petition on the basis of the trial transcript. This is an appeal from the decision of the district court.

■ Respondent contends that petitioner has failed to exhaust his state remedies because he did not appeal from the denial of his 1968 writ of error. Under Massachusetts law the denial of a writ of error can be appealed to the full bench of the Supreme Judicial Court on the grounds that "the single justice abused his powers or that his action was arbitrary and unjustifiable." Commonwealth v. Sacco, 261 Mass. 12, 17, 158

N.E. 167, 169, cert. denied. 275 U.S. 574, 48 S.Ct. 17, 72 L.Ed. 434 (1927); *accord,* McGarty v. Commonwealth, 326 Mass. 413, 414–415, 95 N.E. 2d 158, 159, cert. denied, 340 U.S. 886, 71 S.Ct. 199, 95 L.Ed. 643 (1950). *See generally* K. Smith, Massachusetts Practice: Criminal Practice and Procedure § 1244 (1970). In response, petitioner appears to take the position that under the "futility doctrine" he had no obligation to seek a writ of error in the first place.[2] He contends that the writ cannot be used to correct the trial court's failure to suppress illegal evidence, since that is an issue which there was a "legally sufficient opportunity to litigate" at trial. *See* Aronson v. Commonwealth, 331 Mass. 599, 602, 121 N.E.2d 669, 671 (1954). Yet the Supreme Judicial Court has considered suppression of evidence questions on writ of error in at least two recent decisions. *See* Gilday v. Commonwealth, 355 Mass. 799, 247 N.E. 2d 396 (1969); Richardson v. Commonwealth, 355 Mass. 112, 243 N.E.2d 801, 803 (1969). Where the state court has indicated a willingness to broaden its traditional remedies in order to reach federal constitutional claims, petitioner must initially seek relief in that court. Grayson v. Montgomery, 421 F.2d 1306, 1309–1310 (1st Cir. 1970).

■ In the instant case, however, petitioner was not obligated to seek a writ of error since the admissibility of his confession has already been reviewed by the full bench of the Supreme Judicial Court on direct appeal. Brown v. Allen, 344 U.S. 443, 447–450, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Connor v. Picard, 434 F.2d 673 (1st Cir. 1970); R. Sokol, Federal Habeas Corpus § 22.2 (2d

---

1. On September 5, 1962, petitioner had filed another writ of error challenging his conviction on grounds other than those raised on direct appeal. That writ was allowed by the single justice, who then ruled against him on the merits. Petitioner appealed that ruling to the full bench of the Supreme Judicial Court, which affirmed the decision of the single justice. Makarewicz v. Commonwealth, 346 Mass. 478, 194 N.E.2d 388 (1963).

2. *See* Whippler v. Balkcom, 342 F.2d 388 (5th Cir. 1965); *cf.* Needel v. Scafati, 412 F.2d 761, 765 (1st Cir.), cert. denied, 396 U.S. 861, 90 S.Ct. 133, 24 L.Ed.2d 113 (1969). *See generally* Note, Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1097–99 (1970).

ed.1969) ; Note, Developments in the Law—Federal Habeas Corpus, note 2 *supra*, at 1096. This is not a case in which, during the period since petitioner's contention was considered by the state court, the United States Supreme Court has announced a new legal principle whose applicability must first be considered by the Massachusetts court. *See* Sullivan v. Scafati, 428 F.2d 1023, 1024 n. 1 (1st Cir. 1970) ; *cf.* Subilosky v. Massachusetts, 412 F.2d 691 (1st Cir. 1969). For these same reasons petitioner was not obligated to move for a new trial pursuant to Mass.Gen.Laws ch. 278, § 29. And his failure to apply to the United States Supreme Court for certiorari following the Massachusetts court's affirmance of his conviction does not bar federal habeas relief now. Fay v. Noia, 372 U.S. 391, 435–438, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) ; Hedberg v. Pitchess, 362 F.2d 511 (9th Cir. 1966).

■ Because this case was tried prior to the Supreme Court's decisions in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), we must "examine the entire record and make an independent determination of the ultimate issue of voluntariness." Davis v. North Carolina, 384 U.S. 737, 741–742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966). Because much of the relevant trial testimony by petitioner and the police was directly contradictory and because neither the trial court nor the jury made any express findings of fact, we limit our consideration here to the undisputed facts. Reck v. Pate, 367 U.S. 433, 435, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) ; Thomas v. Arizona, 356 U.S. 390, 402– 403, 78 S.Ct. 885, 2 L.Ed.2d 863 (1958).

Petitioner argues that a consideration of the "totality of the circumstances" that preceded the confession, Fikes v. Alabama, 352 U.S. 191, 197, 77 S.Ct.

281, 1 L.Ed.2d 246 (1957), shows that his confession was not voluntary. He stresses his age (15), lack of education (he had not completed the ninth grade), low mentality (I.Q. of 74 or 84 according to two different tests administered shortly after the crime), lack of prior experience with police interrogation, and the time and duration of the questioning. However, we do not find the circumstances in this case inherently coercive. Petitioner was brought to the Norwood Police Station from his home at approximately 12:15 a. m., Saturday morning, November 6, 1954. According to a stipulation made before the district court, he was interrogated for approximately two hours, in three relatively brief sessions, before confessing.[3] The longest interrogation was the first, which lasted from 12:15 to 1:45 a. m. Petitioner was then fingerprinted and given a benzidin test, which revealed the presence of a significant amount of blood on his body, particularly around his groin. The second interrogation was conducted between 3:18 and 3:45 a. m. Petitioner was then allowed to rest for about five hours during which time he was given a phenobarbital pill supplied to the police by his father. He confessed shortly after the beginning of the third interrogation, which began at 9:12 a. m.

■ A stenographic transcript was recorded during the interrogation. Although petitioner contradicted much of the factual content of that transcript at trial, in this proceeding he relies heavily on it to document his complaints about the treatment he received from the police. The transcript reveals, however, that the police were generally very polite and restrained. Petitioner's father, who waited in the police station most of the night, was not denied access to his son; indeed, he never requested to see him. Nor did petitioner ask to see his parents

---

3. Petitioner was interrogated by Sgt. Walter Bogdanchik and Lt. William H. Delay of the Massachusetts State Police, Chief Mark Folan and Lt. James Murphy of the Norwood Police and District At-

torney Myron Lane. Mr. George Kenney, a clerk in the District Attorney's office, recorded a stenographic transcript in shorthand.

or counsel. While we adhere to the opinion that early morning confessions by youngsters after a full night of police custody are inherently suspect, Michaud v. Robbins, 424 F.2d 971, 976 (1st Cir. 1970), the circumstances here fall far short of those described in Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L. Ed. 224 (1948) (fifteen-year-old boy grilled in relays for five straight hours before his 5 a. m. confession, then held incommunicado for 2½ days), Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) (fourteen-year-old boy held incommunicado for 5 days), and Reck v. Pate, *supra* (nineteen-year-old youth of subnormal intelligence subjected to 6–7 hour interrogation sessions and intermittent public exhibition in "show-ups"). *See* Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Michaud v. Robbins, *supra*.

▆▆ In evaluating any threatening or intimidating remarks made by the police we must weigh "the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953). The "question in each case is whether the defendant's will was overborne *at the time he confessed.*" Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed. 2d 922 (1963) (emphasis ours). During the first interrogation the police made statements like, "Of course, you are telling an awful [*sic*] peculiar story, you know that * * *. You don't expect anybody to believe that story, do you?" The transcript of the interrogation reveals, however, that petitioner was undaunted by such remarks:

"Sgt. Bogdanchik. * * * Isn't that a fact you rehearsed that story quite a bit?

"A. Do you want to see my script?

"Sgt. Bogdanchik. Don't clown. This is pretty serious, you know that don't you?

"A. Yes."

During the second interrogation, after the police had learned that the benzidin test showed blood on petitioner's body, they made statements like, "Something took place in that house that you got [*sic*] that blood all over you. * * * We are going to stay here a week, or ten weeks, or ten years until we find out." But again petitioner refused to be intimidated. He insisted a blackbird he had killed with his B-B gun the previous day accounted for the blood.[4]

▆ Petitioner confessed, not under the pressure of threatening remarks, but after he was confronted with the evidence against him. At the beginning of the third interrogation he was informed that his fingerprints had been found at the scene of the crime and that the benzidin test had revealed the presence of blood on his clothes. He had apparently hidden the dungarees he had worn that evening in the hamper at his home, but the police found them and brought them to the station. Immediately after he was shown the blood stains around the fly section of the dungarees, petitioner confessed. That confession resulted not from pressure but from the "inward consciousness * * * of being confronted with evidence of guilt which [he] could neither deny nor explain." Stein v. New York, *supra*, 346 U.S. at 185, 73 S.Ct. at 1093. *See* Thomas v. Arizona, *supra*, 356 U.S. at 400–402, 81 S.Ct. 1541; *cf.* Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (petitioner's repeated requests to call his wife were not granted until he confessed); Lynumn v. Illinois, *supra*, 372 U.S. at 534, 83 S.Ct. 917 (confession made as a direct result of police threats to cut off state financial

---

4. "Sgt. Bogdanchik. You have taken us on fairy tales, haven't you?

"A. No.

"Sgt. Bogdanchik. What is the story on the blood if that isn't a fairy tale?

"A. I have got five boxes of B-Bs at my house. Do you want to go up and see?"

aid to petitioner's children and to take her children from her).

Two factors cited by petitioner must be given some weight in his favor. Once the police discovered the presence of blood on petitioner's body for which he had no satisfactory explanation, they did not warn him of his right to remain silent and his right to counsel. While not determinative in this pre-*Escobedo*, pre-*Miranda* setting, their failure to do so is a significant factor that must be taken into account. Davis v. North Carolina, *supra,* 384 U.S. at 740–741, 86 S.Ct. 1761.[5] Similarly, although the delay in bringing petitioner before a magistrate was relatively short, the police had a substantial amount of circumstantial evidence against him by 8:30 a. m. when the state district court opened. Questioning petitioner for a third time at 9:12 a. m. prior to bringing him before the court suggests the possibility of a "callous attitude" on their part, Haley v. Ohio, *supra,* 332 U.S. at 600, 68 S.Ct. 302, and some degree of over-zealousness in attempting to obtain a confession. Yet these two factors, without more, are not sufficient to render petitioner's confession involuntary in view of our overall analysis of the events that transpired. Finally, petitioner suggests that the phenobarbital pill[6] that he took sometime within the five hours prior to his confession may have reduced his powers of resistance. *Cf.* Townsend v. Sain, 372 U.S. 293, 307–309, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). But the evidence showed only that petitioner became drowsy for about ten minutes after taking the pill, and there was no evidence that he took it within the ten minutes immediately preceding the third interrogation.

Affirmed.

---

5. Respondent takes the position that, because petitioner did not stress this factor in his appeal before the Supreme Judicial Court, we cannot consider it here. However, lack of warnings regarding the right to remain silent and the right to counsel were recognized as relevant to the overall issue of voluntariness long before Escobedo v. Illinois, *supra,* and Miranda v. Arizona, *supra. See* Davis v. North Carolina, *supra,* 384 U.S. at 740–741, 86 S.Ct. 1761; Turner v. Pennsylvania, 338 U.S. 62, 64, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949). The Supreme Judicial Court has already had its "opportunity to apply controlling legal principles to the facts bearing upon [this] constitutional claim." United States ex rel. Kemp v. Pate, 359 F.2d 749, 751 (7th Cir. 1966).

6. Petitioner had been taking these pills for some time in order to control the symptoms of epilepsy with which he was afflicted.